**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Peter LICAVOLI, Sr.,
Defendant-Appellant.**

No. 77–1381.

United States Court of Appeals,
Ninth Circuit.

Sept. 13, 1979.

Robert J. Hirsh, Hirsh, Shiner & Polis, P. C., Tucson, Ariz., argued, for defendant-appellant.

Kevin F. O'Malley, Special Atty., Phoenix, Ariz., argued, Daniel G. Knauss, Asst. U. S. Atty., on brief, for plaintiff-appellee.

Before WRIGHT and HUG, Circuit Judges, and INGRAM,* District Judge.

HUG, Circuit Judge:

Peter Licavoli, Sr. appeals his conviction for receiving stolen goods in violation of 18 U.S.C. § 2315. Licavoli contends that the district court should have suppressed evidence obtained through the use of electronic surveillance devices. He also argues that the court committed reversible error in several trial rulings concerning the admissibility or sufficiency of evidence and in other aspects of the conduct of the trial. We affirm the conviction.

## I.

### The Investigation and Trial

In March 1976, a federal judge authorized agents of the Federal Bureau of Investigation to install electronic surveillance devices in the office of an art gallery owned and operated by Licavoli. The F.B.I. had presented evidence to the court tending to show that the surveillance was necessary to their investigation of allegations that Licavoli was acting as a broker in several trans-

---

* Honorable William A. Ingram, United States District Judge for the Northern District of California, sitting by designation.

actions involving stolen diamonds. A finding of probable cause that Licavoli was dealing in stolen diamonds was supported by an affidavit prepared and submitted to the court by the F.B.I.; the substance of the affidavit was based on information obtained by the F.B.I. from two confidential informants whose identities have remained undisclosed. Pursuant to the authorization order, F.B.I. agents installed a wiretap on Licavoli's office phone and placed an electronic listening device within the office to intercept room conversations..

The initial authorization order was issued on March 18, 1976, and expired by its terms at the end of twenty days from that date. The F.B.I. terminated electronic surveillance under the initial order on April 6 and applied for an extension order. On April 9, the authorizing judge issued an order extending his authorization of electronic surveillance for an additional twenty days.

In April 1976, Donald Mason, an undercover agent for the F.B.I., engaged in a series of negotiations with Licavoli for the purchase of diamonds believed by the F.B.I. to be stolen property. In a telephone conversation during this period, Licavoli informed Mason that he had acquired a valuable painting, the "Lucretia," that he wished to sell.[1] At a meeting in Licavoli's gallery office, Licavoli showed to Mason two newspaper articles that clearly stated that the Lucretia had been stolen almost a year earlier from the home of its owner, Charna Signer, in Ohio. With the aid of the electronic listening device planted in Licavoli's office, the F.B.I. recorded two room conversations, one involving Licavoli and his daughter and the other involving Licavoli and an associate, Ron Walker, that tended to show that Licavoli had notice of the theft of the Lucretia. Mason subsequently told Licavoli that he had found a buyer for the painting and paid Licavoli $500 as a down payment. Shortly thereafter, a search warrant was issued, and federal agents seized the Lucretia from Licavoli's art gallery.

On the basis of Licavoli's involvement with the Lucretia, a federal grand jury indicted Licavoli on a charge of knowingly receiving stolen property valued in excess of $5,000 and constituting a part of interstate commerce, in violation of 18 U.S.C. § 2315. No charges were brought on Licavoli's dealings with allegedly stolen diamonds.

At trial, Licavoli presented three major defenses: (1) the Lucretia was not stolen; rather, it was the object of a conspiracy by Charna Signer and others to defraud the insurer of the painting; (2) the Lucretia is not valued in excess of $5,000; and (3) the painting had come to rest in Arizona and therefore was not a part of interstate commerce. The jury rejected Licavoli's defenses and returned a verdict of guilty. Licavoli was sentenced to a prison term of eighteen months and fined $10,000.

## II.

### Issues Presented for Review

With respect to Licavoli's contention that the fruits of electronic surveillance should have been suppressed, the following issues are raised:

1. Are the orders authorizing electronic surveillance facially invalid because they authorized the F.B.I. to enter Licavoli's office surreptitiously to install, maintain and remove electronic surveillance devices?

2. Did the trial court err in failing to grant an evidentiary hearing concerning the reasonableness of the surreptitious entry?

3. Do the authorization orders inadequately specify the suspected criminal conduct to which the intercepted conversations are expected to relate?

4. Did the trial court err in failing to order, on its own motion, an evidentiary hearing on the question of the adequacy of the minimization of electronic surveillance?

5. Was Licavoli entitled to an evidentiary hearing on his allegation that a Govern-

---

1. Evidence introduced at trial tended to show that the Lucretia is the sole surviving secular work of the Fifteenth Century artist Dominico Puligo.

ment affidavit supporting the F.B.I.'s application for the authorization orders contained material misrepresentations?

With respect to the conduct of the trial, the following issues are raised:

1. Did the Government fail to establish a proper foundation for the admission into evidence of an expert appraisal of the value of the Lucretia?

2. Did the trial court commit plain error in admitting into evidence testimony of Licavoli's collateral misconduct relating to his dealings with allegedly stolen diamonds?

3. Did Walker retain his privilege against self-incrimination at trial even though he had testified to relevant matters before the grand jury?

4. Did the trial court err in refusing to allow Licavoli to call as witnesses persons who would have invoked their privilege against self-incrimination and refused to testify?

5. Is the evidence insufficient to support a finding that the Lucretia was part of interstate commerce when Licavoli received the painting?

### III.

#### Suppression of the Fruits of Electronic Surveillance

We first turn to Licavoli's contentions that the F.B.I. engaged in illegal electronic surveillance of his gallery office, and that the evidence derived from the surveillance should have been suppressed. We are concerned here with the requirements of both the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1976).

Title 18 U.S.C. § 2515 prohibits the receipt into evidence of the contents of a communication, or evidence derived therefrom, if the disclosure would be in violation of Title III. The grounds on which a motion to suppress may be brought are set forth in § 2518(10)(a). At the time of Licavoli's trial, that section provided in part:

Any aggrieved person . . . may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the ground that—

(i) the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

Section 2518(1)–(8) sets forth the procedures that must be followed and the requirements that must be met to obtain a valid authorization order for electronic surveillance and to engage in the lawful interception of communications.

Over the objections of the defense, the Government introduced at trial recordings of the two intercepted conversations that tended to show that Licavoli knew that the Lucretia was stolen. Although other evidence was introduced on the question of Licavoli's state of mind, we will assume that the admission of the recorded conversations was material to the outcome of the case, and we thus reach the merits of Licavoli's arguments.

#### A. Authorization of Surreptitious Entry to Plant the Listening Device

The initial court order authorizing electronic surveillance and the extension order each authorized the F.B.I. to "enter [Licavoli's office] surreptitiously for the purpose of installing, maintaining, and removing" electronic listening devices. Licavoli contends that Title III does not permit surreptitious entry to plant a listening device and that the authorization and extension orders thus are facially invalid. In the alternative, he argues that if surreptitious entry is permitted by Title III, both Title III and the Fourth Amendment require specific court authorization for surreptitious entry, and the authorization order and extension order in this case are overly broad.

Title III is silent on the question of the authority of the courts to authorize break-ins or surreptitious entry for the purpose of

installing eavesdropping devices. The question whether the power to authorize surreptitious entry can be implied from the explicit statutory grant of power to authorize the interception of communications, which sharply divided the circuits, has now been authoritatively answered by a recent decision of the Supreme Court, *Dalia v. United States,* 441 U.S. 238, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979). In *Dalia,* the Court held that Congress intended to confer power upon the courts to authorize covert entries for the purpose of implanting listening devices and that the "Fourth Amendment does not prohibit *per se*" such covert entries. 441 U.S. at 248, 99 S.Ct. at 1689, 60 L.Ed.2d at 187.[2] The Court further held that because it is "implicit in bugging authorizations" that covert enter may be necessary for the installation of surveillance equipment, a Title III electronic surveillance order need not include a specific authorization to enter covertly the premises described in the order. 441 U.S. at 258, 99 S.Ct. at 1694, 60 L.Ed.2d at 193.

Under the holding of *Dalia,* the authorizing judge was empowered to authorize covert entry into Licavoli's office; therefore, the authorization and extension orders did not violate either the statute or the Fourth Amendment.

B. *Evidentiary Hearing on Reasonableness of Entry*

■ In a supplemental brief filed after the *Dalia* decision, appellant contends that he was entitled to an evidentiary hearing concerning the reasonableness of the surreptitious entry to install the electronic surveillance device, relying upon the statements in *Dalia* that the manner in which a warrant is executed is subject to later judicial review as to reasonableness. 441 U.S. at 258, 99 S.Ct. at 1694, 60 L.Ed.2d at 193.

He states that this evidentiary hearing was requested and refused, and that the case should be remanded for such a hearing at this time. In a pretrial motion addressed to the claimed constitutional overbreadth of surveillance orders, he argued that the orders should have specified greater detail and closed with the sentence:

> In the alternative, the defendant contends that at a minimum, he is entitled to an evidentiary hearing to determine if the surreptitious entry in the case at bar was, in fact, carried out with the minimum intrusion possible with the defendant's right of privacy  . . . ."

Although the trial court did not grant a separate pre-trial or post-trial hearing on the question of reasonableness, the appellant had ample opportunity to inquire into the matter at trial. Special F.B.I. Agent Louis George, who was the agent in charge of the investigation, and who had signed the affidavits supporting the electronic surveillance application, was called to the stand by the Government. He was examined and cross-examined in open court and, at the request of the appellant, was further examined outside the presence of the jury, before the jury heard the tape of the recorded conversations. The cross-examination revealed that the bugging device was installed at the same time as the telephone tap on March 18th, and was removed on April 30th, at the time a conventional search was conducted on the premises pursuant to a valid search warrant. Mr. George further testified that the microphone was operating only during the two successive twenty-day periods authorized by the court, and that minimization requirements were followed. He testified concerning the location of the device, which was in the first floor front office of the art gallery. The appellant had full opportunity to devel-

---

**2.** In *Dalia,* the Court defines the term "covert" in the following manner:

> As used here, "covert entry" refers to the physical entry by a law enforcement officer into private premises without the owner's permission or knowledge in order to install bugging equipment. Generally such an entry will require a breaking and entering.

*Dalia v. United States,* 441 U.S. 241 n.2, 99 S.Ct. 1685, 60 L.Ed.2d 182. This definition appears to encompass the kind of entry that the district court in this case intended to authorize when it used the term "surreptitiously."

op any facts concerning the placement and removal of the electronic device and the reasonableness of the intrusion. The appellant points to no circumstances indicating that the execution of the electronic surveillance was unreasonable. A remand for an evidentiary hearing is not required.

## C. *Specification of Offenses*

█ ° The authorization and extension orders authorized the F.B.I. to intercept communications relating to several offenses, including the offense of "receiving, concealing, storing, bartering, selling or disposing of goods, wares, or merchandise of the value of $5,000 or more, which are moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken in violation of Title 18, United States Code, Section 2315." Licavoli contends that the orders did not state with sufficient particularity the offense to which the interceptions should relate, in violation of 18 U.S.C. § 2518(4)(c) and of the specificity requirements of the Fourth Amendment. He argues that at the time the orders were issued, he was suspected of dealing in stolen diamonds only, and that the orders should have limited interception to communications relating to dealings in illegitimate diamonds. If the orders had described Licavoli's suspected criminal conduct with such particularity, the contents of intercepted communications relating to the stolen painting arguably could not have been legally disclosed absent judicial approval upon separate application to the court. *See* 18 U.S.C. § 2517(5).

█ The authorization orders did not violate the specificity requirements of the Fourth Amendment. The Government must show that it has probable cause to believe that a specific crime has been or is being committed before it may be permitted to invade constitutionally-protected areas. *See Berger v. New York,* 388 U.S. 41, 59, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967). The elements that must be specified in a search warrant, however, are related only indirectly to the suspected offense:

The Fourth Amendment requires specification of "the place to be searched, and the persons or things to be seized." In the wiretap context, those requirements are satisfied by identification of the telephone line to be tapped and the particular conversations to be seized.

*United States v. Donovan,* 429 U.S. 413, 427 n.15, 97 S.Ct. 658, 668, 50 L.Ed.2d 652 (1977). Although the conversations to be intercepted by electronic surveillance are necessarily identified partly in terms of the suspected offenses to which they will relate, the content of the communications to be intercepted cannot be known in advance, and the authorizing order need not describe every aspect of the criminal activity expected to be revealed by the surveillance. "The order must be broad enough to allow interception of any statements concerning a specified pattern of crime." *United States v. Tortorello,* 480 F.2d 764, 780 (2d Cir.), *cert. denied,* 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). It was not required in this case that the orders specify the conversations to be seized in the detailed and restrictive manner urged by Licavoli; the reference in the orders to stolen goods generally, rather than stolen diamonds, was sufficient to satisfy the mandates of the Fourth Amendment.

█ A similar analysis leads to the conclusion that the authorization orders are valid under the provisions of the statute. Title 18 U.S.C. § 2518(4)(c) provides that an order authorizing the interception of communications shall include "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." At least with respect to the problem of identification of the suspected criminal conduct, the requirements of § 2518(4)(c) are satisfied by the recital in the authorization orders of the elements of the statutory offense to which the communications sought to be intercepted would relate. *See United States v. Cohen,* 530 F.2d 43, 45–46 (5th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 149, 50 L.Ed.2d 130 (1976); *United States v. Principie,* 531 F.2d

1132, 1139 (2d Cir. 1976), *cert. denied,* 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977).

### D. *Hearing on Minimization*

Licavoli moved the district court to suppress the fruits of electronic surveillance on the ground that the surveillance of his office was not properly minimized, in violation of 18 U.S.C. § 2518(5), but he neglected to request an evidentiary hearing on the question of minimization. On appeal, he contends that the court erred in denying his motion to suppress without *sua sponte* ordering an evidentiary hearing. We disagree.

■ An evidentiary hearing on a motion to suppress ordinarily is required if "the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Ledesma,* 499 F.2d 36, 39 (9th Cir.), *cert. denied,* 419 U.S. 1024, 95 S.Ct. 501, 42 L.Ed.2d 298 (1974); *accord, United States v. Losing,* 539 F.2d 1174, 1177 (8th Cir. 1976) (applying the *Ledesma* standard to a motion to suppress the fruits of a wiretap). A hearing is not required if the grounds for suppression consist solely of conclusory allegations of illegality. *See id.* at 1178. "The question of whether an evidentiary hearing is appropriate rests on the reasoned discretion of the district court." *United States v. Santora,* 600 F.2d 1317, at 1320 (9th Cir. 1979).

■ Licavoli's motion to suppress alleges failure to minimize only in general and conclusory terms; he makes no specific allegations raising contested issues of fact. The record shows that the court closely supervised the electronic surveillance through the use of periodic interim reports, and that the F.B.I. undertook, in good faith and with adequate success, the minimization of the interception of innocent conversations. Under these circumstances, the district court did not err in denying the motion to suppress without ordering on its own motion a hearing on the question of minimization. The district court did not abuse its discretion in this case. *See Santora,* at 1320.

### E. *Hearing on Misrepresentation in Affidavit*

■ On pretrial motions to suppress, Licavoli alleged that an affidavit presented in support of the F.B.I.'s application for an order authorizing electronic surveillance contained misrepresentations material to the issues of probable cause and the necessity for electronic surveillance. The challenged affidavit was prepared by an F.B.I. agent from information given to the F.B.I. by two confidential informants whose identities have remained undisclosed for their protection. Licavoli asserts that he has correctly guessed the identities of the two informants; his allegations of misrepresentation are based on information he has obtained from the two persons who he thinks are the informants. He contends that the district court erred in refusing to grant his request for an evidentiary hearing on his allegations of misrepresentation.

The defendant is entitled to a hearing only upon a substantial preliminary showing that the statements in the affidavits concerning facts material to the finding of probable cause are deliberately false or made with reckless disregard for the truth. *Franks v. Delaware,* 438 U.S. 154, 164–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Young Buffalo,* 591 F.2d 506, 509 (9th Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 2178, 60 L.Ed.2d 1055 (1979).

■ The district court conducted an *in camera* hearing to determine whether Licavoli had made a substantial showing of governmental misrepresentation. After interviewing one of the confidential informants and examining the affidavit of the other, the court concluded that no showing of misrepresentation justifying a full evidentiary hearing had been made. Our review of the *in camera* record supports that conclusion. The trial court properly denied Licavoli's request for a hearing.

## IV.

### Conduct of Trial

#### A. Admissibility of Expert Appraisal

As part of its proof of the jurisdictional amount of $5,000, the Government introduced into evidence a record of an appraisal of the value of the Lucretia prepared by Sam Aranoff, an appraiser retained by Charna Signer and her insurance company. Aranoff valued the Lucretia at $10,000, and the insurer adopted the appraisal as the basis for settling Charna Signer's insurance claim arising out of the theft of the Lucretia. Over the objection of the defense, the appraisal was admitted into evidence as a business record of the insurance company. Licavoli argues on appeal that the Government failed to establish a proper foundation for the admission of the expert appraisal.

Rule 803(6) of the Federal Rules of Evidence provides an exception to the hearsay rule for records of regularly conducted activity:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

Licavoli does not assert that the Government failed to establish the elements of a business record specified in Rule 803(6). Rather, he challenges Aranoff's qualifications to give an expert appraisal. Licavoli contends that although Rule 803(6) expressly authorizes the admission of a business record containing opinions, it does not dispense with the general requirement in Fed.

R.Evid. 702 that the qualifications of an expert witness be established. Because the Government failed to establish Aranoff's expert qualifications, Licavoli argues that the business record containing Aranoff's expert opinion of the value of the Lucretia was inadmissible.

The question raised by Licavoli is one for which there is little helpful precedent. The issue is no longer controlled by the cases cited by the parties that discuss the Commonwealth Fund Act, 28 U.S.C. § 1732(a), which does not expressly allow the admission of a business record containing opinion. In construing Rule 803(6), we bear in mind the statement of purpose and rule of construction set forth in Fed.R.Evid. 102:

These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.

■ The focus of the business records exception to the hearsay rule is on the requirements that the record be made in the course of and as a regular practice of a regularly conducted business activity. See generally Fed.R.Evid. 803(6), Notes of Advisory Committee on Proposed Rules, Note to Paragraph (6). There are circumstantial guarantees of trustworthiness in a record contemporaneously prepared by one who acts under a business duty of care and accuracy, particularly when the business entity for which the record is made relies on it.

■ We see no reason to adopt an inflexible rule that every case requires the proponent of a business record containing expert opinion to affirmatively establish the qualifications of the person forming the opinion. Rule 803(6) expressly provides for the exclusion of a business record if the source of information indicates a lack of trustworthiness. That provision allows the trial judge, in the exercise of his or her discretion, to exclude from evidence a record of the opinion of an expert whose quali-

fications are seriously challenged. *See* 4 Weinstein's *Evidence* ¶ 803(6)[04], at 803–160, ¶ 803(6)[05], at 803–167 (1978); *see also* McCormick on Evidence § 307, at 721–22 (2d ed. 1972).

In this case, Licavoli failed to alert the district court to specific facts raising any doubt concerning Aranoff's qualifications as an appraiser. Moreover, the insurer's reliance on Aranoff's appraisal is affirmative evidence of the reliability of the appraisal. It was in the interest of the insurance company to pay no more on Charna Signer's claim than the painting was actually worth; had the insurer doubted Aranoff's qualifications or entertained a belief that the Lucretia was worth significantly less than $10,000, it is unlikely that the insurer would have adopted Aranoff's appraisal. The trial judge did not abuse his discretion in admitting the business record into evidence.

## B. *Evidence of Collateral Misconduct*

Licavoli contends that the trial court erred in failing *sua sponte* to exclude from evidence testimony that included references to Licavoli's alleged dealings with stolen diamonds. We find no reversible error.

Licavoli did not object to the testimony at trial; therefore, he is entitled to no relief on appeal unless the admission of the testimony amounts to plain error. Fed.R.Crim.P. 52. We will not reverse for plain error unless it appears necessary to avoid a miscarriage of justice or to preserve the integrity or reputation of the judicial process. *United States v. Eskridge,* 456 F.2d 1202, 1204–05 (9th Cir.), *cert. denied,* 409 U.S. 883, 93 S.Ct. 171, 34 L.Ed.2d 138 (1972).

The challenged testimony related to Licavoli's alleged criminal "fencing" activities and was directly relevant to the statutory offense with which Licavoli was charged. Such evidence may have been admissible pursuant to Fed.R.Evid. 404(b) as evidence of an ongoing criminal scheme or a pattern of crime. *Cf. United States v. Brashier,* 548 F.2d 1315, 1325–26 (9th Cir.

1976), *cert. denied,* 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977). In any event, Licavoli's counsel was able to mitigate the prejudicial effect of the testimony through effective cross examination. Even assuming the testimony was inadmissible under the Rules of Evidence, considering both the probative value and the prejudicial effect of the testimony, the failure of the trial court *sua sponte* to exclude the testimony did not rise to the level of plain error.

## C. *Waiver of Privilege Against Self-incrimination*

Ron Walker testified before the grand jury in this case in a manner favorable to Licavoli on the issues of the value and the interstate character of the Lucretia. At trial, however, Walker invoked his privilege against self-incrimination and refused to testify. Licavoli argues that Walker waived his privilege under the Fifth Amendment when he testified before the grand jury, and that the trial court erroneously allowed Walker to invoke the privilege at trial.

It is settled that a waiver of the Fifth Amendment privilege is limited to the particular proceeding in which the waiver occurs. *United States v. Trejo-Zambrano,* 582 F.2d 460, 464 (9th Cir.), cert. denied, 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 682 (1978); *United States v. Cain,* 544 F.2d 1113, 1117 (1st Cir. 1976). Consequently, voluntary testimony before a grand jury does not waive the privilege against self-incrimination at trial. *United States v. Housand,* 550 F.2d 818, 821 n.3 (2d Cir.), *cert. denied,* 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1066 (1977). A contrary conclusion was reached in *Ellis v. United States,* 135 U.S.App.D.C. 35, 416 F.2d 791, 800 (1969); however, the *Ellis* court acknowledged that it had chosen to depart from the prevailing rule, and we decline to follow that decision. The trial court correctly ruled that Walker validly asserted his privilege at trial.

Furthermore, we note that Licavoli suffered little prejudice from Walker's refusal to testify. Licavoli was permitted to have Walker's grand jury testimony read to the

trial jury and thus was able to present the substance of Walker's expected trial testimony.

## D. Denial of Request to Call Witnesses

At trial Licavoli desired to call as witnesses Ron Walker and four members of the Signer family. Outside of the presence of the jury, the trial court determined that each prospective witness, if called, would refuse to testify on the grounds of self-incrimination. The court ruled that Licavoli would not be allowed to call Walker and the Signers as witnesses. Licavoli contends that he should have been allowed to call Walker and the Signers to the stand, in front of the jury, to demonstrate to the jury that he was not reluctant to confront those persons as witnesses.

Licavoli does not contest that each of the Signers could validly invoke the privilege against self-incrimination and, as previously stated, Walker did not waive his privilege to refuse to testify at trial. The prosecutor was under no duty to grant immunity to the prospective witnesses to remove the constitutional obstacle to calling them to the stand. *United States v. Trejo-Zambrano,* 582 F.2d at 464; *United States v. Bautista,* 509 F.2d 675, 677 (9th Cir.), *cert. denied,* 421 U.S. 976, 97 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Consequently, because the trial court determined that Walker and the Signers would refuse to testify if called, the court correctly ruled that Licavoli could not call them as witnesses for the sole purpose of compelling them to invoke their Fifth Amendment privilege in front of the jury. *See United States v. Espinoza,* 578 F.2d 224, 228 (9th Cir.), *cert. denied,* 439 U.S. 849, 99 S.Ct. 151, 58 L.Ed.2d 151 (1978); *United States v. Roberts,* 503 F.2d 598 (9th Cir. 1974), *cert. denied,* 419 U.S. 1113, 95 S.Ct. 791, 42 L.Ed.2d 811 (1975); *United States v. Beye,* 445 F.2d 1037 (9th Cir. 1971).[3]

## E. Interstate Commerce

Approximately two months after the Lucretia disappeared from Charna Signer's home in Ohio, the painting surfaced briefly in Los Angeles, California. From Los Angeles, the painting was shipped to Tucson, Arizona, where it was picked up by Arlene Signer, the former daughter-in-law of Charna Signer. The painting remained at Arlene Signer's residence for almost one year before Licavoli obtained possession of it. At trial Licavoli moved the court for a judgment of acquittal on the ground that the Government had failed to show that the Lucretia was a part of interstate commerce when Licavoli received it, an essential element of 18 U.S.C. § 2315. Licavoli now challenges the trial court's denial of that motion.

Whether the interstate movement of a stolen article has come to an end generally is a question of fact, to be determined by the jury. *Corey v. United States,* 305 F.2d 232, 236 (9th Cir. 1962), *cert. denied,* 371 U.S. 956, 83 S.Ct. 511, 9 L.Ed.2d 503 (1963); *United States v. Jones,* 564 F.2d 1315, 1317 (9th Cir. 1977). In this case, the trial court properly denied the motion for acquittal when there was relevant evidence from which the jury could reasonably infer that the Lucretia was still in interstate commerce when Licavoli obtained possession of it. *See Corey,* 305 F.2d at 237; *United States v. Rojas,* 554 F.2d 938, 943 (9th Cir. 1977).

The jury was not precluded from finding a continuation of interstate movement merely because the Lucretia was transferred from the initial recipient in the destination state to Licavoli; the jury could conclude that Licavoli acted as a "fence," and that the transfer was an integral part of an essentially continuous transaction. *See United States v. Tobin,* 576 F.2d 687, 693 (5th Cir.), *cert. denied,* 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *Corey,* 305 F.2d at 236. The critical question is wheth-

---

**3.** We note that the district court minimized any prejudice suffered by Licavoli by instructing the jury that the Signers were unavailable to either party and that no adverse inference could be drawn from a party's failure to call the Signers as witnesses. Licavoli did not request that a similar instruction be given concerning Walker's availability as a witness.

er the painting had remained in storage in Arlene Signer's residence for a sufficiently long period of time that the jury could not reasonably conclude that the interstate movement of the painting had not terminated. *Cf. United States v. Thies,* 569 F.2d 1268, 1272 (3d Cir. 1978); *United States v. Tobin,* 576 F.2d at 693.

In determining whether the interstate movement of a stolen article has come to an end, the jury may consider the nature of the article and the manner in which it must be disposed of. *Lee v. United States,* 363 F.2d 469, 475 (8th Cir.), *cert. denied,* 385 U.S. 947, 87 S.Ct. 323, 17 L.Ed.2d 227 (1966). If the article is difficult to dispose of in normal commercial channels or must be concealed until publicity concerning its theft has subsided, it may retain its interstate character for a substantial period of time after reaching the destination state. *See id.; Tobin,* 576 F.2d at 693; *Pearson v. United States,* 378 F.2d 555, 560 (5th Cir. 1967). Thus, it was held in *Tobin* that the jury could reasonably conclude that stolen statutes remained in interstate commerce for two years after their arrival in the destination state, because there was evidence from which the jury could infer that the works of art were easy to identify and had been concealed to facilitate resale. 576 F.2d at 693.

The jury in this case could readily infer that the Lucretia was a unique work of art, not easily disposed of in normal commercial channels. Indeed, there was evidence tending to show that the storage of the Lucretia in Arlene Signer's residence for almost one year served the combined purposes of concealing the painting until publicity of the theft had subsided and allowing Signer to obtain an appraisal of the painting and to find a suitable dealer who would agree to resell it. The jury could reasonably conclude that the Lucretia was a part of interstate commerce when Licavoli received it. The trial court properly denied Licavoli's motion for acquittal.

V.

*Conclusion*

The judgment of the trial court is affirmed.